Thank you. May it please the court. My name is Howard Anderson. I'm an attorney for Richard Watkinson, who is a prisoner in the Alaska Dep't of Corr. This case involves three claims, one under RLUPA, one under the Free Exercise Clause, and a third under Equal Protection. Those claims are brought with respect to the Prisoner Welfare Fund, which, as the court knows from the briefs, is a fund that gets its money from a surcharge on commissary purchases. And the specific focus that we're looking at is concerning the firewood that the Prisoner Welfare Fund has already purchased, and then also the juice and honey that Mr. Watkinson would like to have the Prisoner Welfare Fund purchase. At bottom, what Mr. Watkinson is asking the court to do is to say that the Prisoner Welfare Fund, as it is currently operated, is illegal because it is treating religion worse than non-religion. And what he's asking for is declaratory and adjunctive relief to require the state to apply religiously neutral grounds for evaluating a request under the Prisoner Welfare Fund. Let me ask you this, if I may. If the Prisoner Welfare Fund did not exist, what would your claim be, if any? Your Honor, I fully concede that the state is not required to have a Prisoner Welfare Fund, and if Alaska abolished it tomorrow, he would not have any constitutional or statutory basis to require the state to establish a Prisoner Welfare Fund. Does that then eliminate your free exercise claims? No, Your Honor, because the state has chosen to have a Prisoner Welfare Fund, and if it chooses to have one, it has to operate it in a religiously neutral manner. That sounds like an Establishment Clause claim or an Equal Protection claim. I'm not trying to get rid of your Equal Protection claim because you've got a sense of, hey, you've got to treat these things equally. Now, whether or not that's a valid claim is a different question, but I'm trying to figure out the relationship between the Welfare Fund and the straightforward religious claims. And I'm having trouble seeing that you have a straightforward religious claim, given your concession, that were there no Prisoner Welfare Fund, the free exercise claim wouldn't be there. Well, Your Honor, I think that the real function of the free exercise claim is that is what distinguishes between religion and non-religion, whereas the Anti-Establishment Clause says you can't treat one religion better than a different religion. And so here, to the extent that the sweat lodge is a cultural group and not a religious group, I think we're really talking about the free exercise clause because we are favoring non-religion over religion, if that makes sense. Thank you. On your RLUIPA claim, because the statute specifically says that you can't require funding than, for example, purchase of firewood and other implements, what's the basis then for the violation? Well, what Mr. Watkinson is asking the state to do is what the state previously allowed him to do, which is to have him and the other members of his congregation donate their own money to reimburse the state for the purchases of the juice and the honey. And so he's not asking unnecessarily that the Prisoner Welfare Fund sort of buy it at a net cost to the state, but that he wants to have the ability to donate the money as a cultural group, the gardening group at one of the other institutions does. So let me understand, going back, if there is no Prisoner Welfare Fund and you simply have him in the prison, he has presumably some prisoner money that he's free to spend on certain things, correct? I think that is, if the state allows an inmate to have a trust fund, which I'm not sure they are required to allow. But the question is here, does he have that option? I mean, in other words, it's kind of a gymnastic complication to say, well, I understand you can't fund it, but now I want to donate the money to your fund and then you can fund it from there. So my question is whether he has, in effect, the typical prisoner trust fund out of which he could just buy something, or would his buying of those items be somehow prohibited? Well, Your Honor, as I understand it, the state is allowing the purchase of juice from the commissary subject to a 3 percent surcharge that the state is imposing on the purchases of the juice. And so the state is making it, in some ways, more difficult than it would have to be because it's got this tax, for lack of a better word, that's funding the Prisoner Welfare Fund. Well, that makes sense. I don't know if it makes sense or not in terms of what the prison is doing, but I'm trying to fit it into the RLUIPA claim. Because really what you're asking them is to fund it. Now you're saying, no, no, we're only not asking them to fund it. We want to put our money in and then they will buy it. Is that right? Well, Your Honor, I would be perfectly happy if the state were ordered to fund it under RLUIPA, but I don't think that… Right. But my point is, whether it's under the statute or under the Constitution, that you can't penalize religion. And that's what I think that the state is doing here is that if Mr. Watkinson were a complete atheist and he wanted to propose that the state provide firewood so that prisoners could have a bonfire on July the 4th, the warden would have the discretion to approve it or not. But because Mr. Watkinson has a subjective religious purpose for wanting firewood, then the warden is not allowed to approve that request. And to me, that is the problem. Your argument is confusing me because if you were to give plaintiff parity with the non-religious groups, they're not saying we're going to put our own money in and we want that to be earmarked and then the money will come back to us dollar for dollar. That's not how it works for the general disbursement, right? So you're not asking for parity. You're asking for a special procedure for your client's religious purchases. There is a gardening club at one of the facilities that is able to do just that, to take the money from the garden sales and to maintain this virtual balance that they then use to purchase things for their club operations, for want of a better term. And so if he's asking to be able to do what that gardening club is able to do, and so that's the basis where he's being treated worse than a non-religious group with respect to this virtual balance in the prison welfare fund. So is your Equal Protection Clause argument based on the fact that all religious groups are not permitted that option and yet the gardening club is? Or does it relate to discrimination among religious groups? Well, part of that depends on how the court views the sweat lodge. If the sweat lodge is a non-religious group, then Mr. Watkinson is being treated worse than the two non-religious groups, the sweat lodge and the gardening club. To the extent that the sweat lodge is a religious group, then with respect to the firewood, we're favoring the native religion over the esoteric religion. And so part of it depends on what do we do with the sweat lodge. Is it religious or is it cultural? Your Honor. Yes. And I think that as the court considers the case, the most important case among all the ones that the parties have cited to me is the Rosenberger case involving the University of Virginia. There the Supreme Court held that the University of Virginia in its funding of student organizations could not deny funding to a Christian newspaper. There the university said, well, we can't give money to a student club to publish a Christian newspaper because that's going to be an anti-establishment clause problem. But the Supreme Court said, no, you have to treat everybody the same, and you're not promoting religion by having a generally available benefit. And so I just wanted to point that out to the court. To me, that's probably the most important case of all the ones that are in the briefs. And I would ask to reserve the balance of my time. I do have a question, and this is with respect to the sweat lodge. How is the sweat lodge financed? Is it financed just generally out of the Prison Welfare Fund, or is it financed in the way that your client wants their ceremonies, firewood, juice, and honey to be financed? That is to say, are the sweat lodge people putting in their money and saying, we want that to come back out to us, or are they just making a claim on the fund? As I understand the record, Your Honor, the sweat lodge firewood is funded completely out of the Prisoner Welfare Fund just as a general line item. Independent of any particular contribution by those who partake of the sweat lodge? Yes, Your Honor. That's my understanding. Okay. And on the garden club, the money that's earmarked, that doesn't come from the prisoners themselves. That comes from the people who buy the plants at the plant sale. Is that – Your Honor, I'm unclear as to all the specifics, but as I understand it, they sell plants, I think, to the general public, and the club generates some revenue that then goes into the Prisoner Welfare Fund that is kept just for the use of the garden club. But I don't think they're selling plants to prisoners. I think they're selling plants to civilians. So really what Planko is asking for in terms of ability to put their own funds in and get their own funds back, the Department of Corrections isn't doing that for anyone. Well, I mean in the sense that I guess the garden club – I mean I don't know how it works if you have an unincorporated organization selling items. I mean I assume that some prisoner owns the plants, but what Mr. Waskin is doing is again asking the state to allow the prisoners to pool their money either all at once or when the time comes to place an order so they can avoid the exorbitant costs at the commissary with respect to the juice and honey that they use. Basically what they're after is they want to have the purchasing power or purchasing mechanism that the Prisoner Welfare Fund has that they don't have if they don't go through the Prisoner Welfare Fund. They just want – I'll say it this way. They want the purchasing power or the discount that's available to them if they go through the Prisoner Welfare Fund, but it's not available if they've got to do it outside that fund. That's what they want, sure. I guess because a juice for example is seven times more expensive through the commissary than through the Prisoner Welfare Fund, and for someone who is indigent and making $50 a month, that's a lot to ask for. And so I'll reserve the balance of my time. Just one follow-up question. Yes, Your Honor. My question is the prison is not doing that for any groups, either religious or non-religious. In the sense that we are pooling money from offender trust accounts, I think that is correct. But in the sense that there is a virtual balance, they are doing that for the Garden Club. It's just where the money comes from isn't making a difference. Thank you, Your Honors. Mr. Wilkinson. Thank you, Your Honors. I'm David Wilkinson representing the state of Alaska. What Mr. Wilkinson seeks here is an exemption from two DOC policies, one that prohibits pooling of inmate funds and another that bars the state from buying faith group property. The thrust of his argument is that the state must provide him those exemptions simply because it set aside funds to provide all inmates with charitable, recreational, and educational opportunities. He'd have the state divert those funds from those opportunities for all inmates and instead use them to subsidize his personal religious practices. But this attempt at an end run around DOC's policies… Let me ask you this when he says he seeks to divert those funds. Is the request that the plaintiffs here use their existing contributions or are they requesting that they can contribute more and then just use the purchasing power of the fund? So, as I understand it, Judge Fletcher, there's two requests. One is that the Prisoner Welfare Fund buy wood for the Asatru worship ceremonies. And the other is that the Asatru practitioners be able to pool their money from their offender trust accounts into a line in the Prisoner Welfare Fund and then leverage the fund to buy discounted juice and honey. So there's both an attempt at pooling inmate funds and an attempt at using the funds that already exist in the Prisoner Welfare Fund to purchase articles for their worship. And these attempts, they fall flat because, first, no law requires the state to subsidize Mr. Watkinson's religious worship. And he hasn't shown that declining to do so substantially burdens his religious exercise. He also hasn't suffered any intentional discrimination because of his Asatru identity. So turning first to the substantial burden, this is a predicate to claims under both the Religious Land Use and Institutionalized Persons Act, or ARLUPA, and under the Free Exercise Clause. And as the Supreme Court noted at footnote 8 in Cutter v. Wilkinson, ARLUPA is directed at obstructions that institutional arrangements place on religious observances. There's no obstruction here by requiring Mr. Watkinson to simply comply with the same policies that any other religious practitioner must comply with and purchase his own faith group property. Well, if I'm talking practical terms, in terms of burden on someone who is indigent and in the prison system, the price of the juice for a year goes up from $56 to $423. For an indigent prisoner, that actually, that's not nothing. I mean, to somebody on the outside, the price difference may be manageable, but this strikes me as a burden. Now, whether it qualifies as a substantial burden under First Amendment law is a different question, but I don't think you're arguing that this is trivial to them, are you? Your Honor, the burden of having a financial outlay that's associated with religious exercise is simply not a burden that DOC is obligated to mitigate in these circumstances. That wasn't my question. My question is burden, and then we can move on to the other questions. My question is burden, because you said this is not a substantial burden. Could you help me understand why that's not a substantial burden, given the financial circumstance of an indigent prisoner? Yes, Judge Fletcher. It's not a substantial burden because substantial burdens are defined as more than an inconvenience, something that coerces an inmate to act in a way that's contrary to their religious beliefs. And puts substantial pressure on an inmate to modify behavior in violation of their beliefs. So examples of substantial burdens come up in cases like Jones v. Williams, where an institution forced a Muslim inmate to handle pork in direct violation. But I don't think the cases are only coercion. I think the cases are prevention of practicing religion. So if, for example, the prison were to take away religious artifacts or things that were essential to the practice of the religion, things that did not pose any particular danger in the prison and so on, I think that would be a substantial burden, even though it's not coercing, it's simply preventing. Would you agree with that? Yes, I do agree with that, Judge Fletcher. So here what we're talking about is preventing. And I'll go back to it. The increased price may well prevent. In these circumstances, Judge Fletcher, the record reflects that Mr. Watkinson testified that the times that he went without wood or the quantities of juice and honey that they prefer for their religious exercise was because of a lack of donations from the outside or because they were still waiting to build up enough funds to purchase those. I think you just made the point that that might have been a substantial burden then. Your Honor, I agree that he testified to those hurdles. However, those hurdles do not exist because of DOC policies. They specifically do not exist because of the policies that he's challenged here, which is the prison welfare policy. There you go. That's another way of looking at it. I agree with that. Okay. And to make the point even further, Your Honor, those are hurdles that would exist with or without incarceration, Your Honor. For any indigent practitioner of the Asatru faith, they're going to have to come up with ways to procure these consumable articles that they use to engage in their worship. But the prisoner welfare fund and the use of surcharges on commissary items to fund activities for all inmates to participate in, that's not creating this financial hurdle for the Asatru practitioners. In fact, DOC has accommodated the Asatru practitioners. They built a woodshed in the parking lot of Goose Creek to accept donations of firewood. They urged Watkinson to reach out to the Asatru community. They made the same or similar juice available for purchase at the commissary so he didn't have to use the inadequate powdered juice that would have previously been available. And they allowed him to use his offender trust account to make purchases of honey through a kitchen vendor. So he has been accommodated and he hasn't identified any substantial burden on his religious practice. But even if he had, the DOC's policies still survive under both our LUPA and the Free Exercise Claims because they are the least restrictive means of furthering compelling government interests and they're reasonably related to legitimate penological interests. The first interest that's furthered by these policies are avoiding unconstitutional entanglement with religion. The state had an objectively strong legal basis to conclude that by subsidizing the Asatru worship activities, it would violate the Establishment Clause under the three-part Lemon Test. There's no secular purpose served by buying the Asatru practitioners wood or subsidizing their juice and honey. Watkinson testified that the fires have a spiritual and religious significance and that the juice and honey is used to toast the gods and goddesses. The primary and principal effect of providing this special benefit to the Asatru practitioners or any religious group would be to advance and approve of that religion. That fact is analyzed from the point of view of a reasonable observer who's familiar with the agency's policies. And the courts ask whether it would be likely to be perceived as an endorsement. Here we're talking about using a discretionary fund that's administered with the superintendent's approval and that's structured to provide charitable, recreational, and educational opportunities for all inmates. If that fund is then used to benefit specific religious groups, it will only be perceived as an endorsement of that religious exercise. Third, it would excessively entangle DOC with religion, and here specifically with the Asatru religion. Purchasing items for the Asatru faith group or giving them special exemptions would single them out for special treatment, and it would place DOC's administrators to the untenable choices of having to decide which religious groups should get grants from the Prisoner Welfare Fund, which groups should be prioritized over other groups. As the director of institutions testified at trial, it would be extremely hard to administer this fund in a way that treats everybody equitably. Refusing to exempt the Asatru group from those general prohibitions on purchasing faith group funds, the prohibition on pooling inmates' accounts, is also the least restrictive means of furthering those ends. Again, as the director of institutions testified, with such a diverse inmate population, it's just not feasibly administratively possible to provide every group their fair share. If we crack open this Prisoner Welfare Fund to allow the funding of worship activities, it will get entangled with religion and it cannot be avoided. It will also undermine the fund. The institution should be able to provide charitable, recreational, and educational opportunities for inmates without triggering an obligation to fund worship activities for specific groups. Mr. Anderson suggested that his client isn't really seeking to advantage himself over other religions, but rather, if he were permitted to contribute to the fund, monies that the fund could then use to buy the various religious implements, that he then could avoid the commissary surcharge tax. Is there any other group that's permitted to do that, and is the Garden Club a fair analog? No, Judge McEwen, there isn't another group that's allowed to pool inmate funds in the way that Mr. Watkinson seeks. The Highland Mountain Horticultural Club is not a fair analog. That is essentially an economically self-sustaining club operation where they grow starts and flowers, then they sell them every year, they have their own account, and so the proceeds from those sales are recovered, the cost of running the horticultural program is recovered, and then any excess funds goes into the Prisoner Welfare Fund and is used for those opportunities for all inmates. That's not the same as allowing practitioners of a religious group to pool their money together in a way that would allow them to make discounted purchases. As the Director of Institutions testified at trial, allowing that sort of pooled inmate account would raise serious security concerns with fraud, crimes, paying off debt, and strong-arming. Your Honor, I'd submit that prisons are a dangerous place where really anything can become currency, and allowing inmates to pool their money together in that way is simply something that raises too great of security concerns for DOC to allow it. DOC has reached out to the Department of Administration and to banks about doing this, and it's been denied. It's simply not a possible arrangement that Watkinson proposes here. Now, Watkinson has made a point that what's happening here is treating religion different than non-religion. In his briefs, he relies on the Supreme Court's general benefits case law. He mentioned Rosenberger in his argument, but those cases such as Espinosa, Trinidad-Lutheran, or Rosenberger, they don't set the standard for prisons. Olón versus a state of Chávez sets the standard for free-exercise claims in the prison context and creates a less restrictive free-exercise standard, which is ordinarily applied to alleged infringements outside of the prison context. Those cases don't overrule Olón. They don't change the standard. Moreover, in situations like that, situations like in Trinidad-Lutheran or in Rosenberger, claimants in those cases are otherwise eligible for the benefits that are at issue, but they're only denied because of their religious status. Here, Watkinson seeks exemptions. He's not otherwise eligible. He seeks to use a prisoner welfare fund for something that it's not intended to be used for. So those arguments are simply an opposite. Watkinson was also not discriminated against in violation of the Equal Protection Clause. As DOC explained to him in a letter that appears in Excerpt of Record, page 227, the Asatru Faith Group is just one of myriad faith groups within the Department of Corrections, and no other religious group has been able to use the prisoner welfare fund. They're all treated the same. Watkinson seeks a special privilege. Now, the policies themselves are not discriminatory. The first policy, again, is just that prisoner welfare funds can only be used for charitable, recreational, and educational opportunities. The second policy is that DOC does not buy faith group property. Now, the prisoner welfare fund policy doesn't discriminate against religion. It just serves a completely different purpose. Put another way, faith groups such as Asatru are not similarly situated to the cultural or recreational groups or activities that the institution may choose to set up. One of the ways that they're not similarly situated is we can't expect that providing a worship ceremony for one group is an invitation to all inmates to participate in one activity or one opportunity, or that the institution can endorse a religious exercise as an opportunity that's beneficial to all inmates in the same way that the institution can endorse an activity such as a Fourth of July party or Father's Day breakfast or a Juneteenth celebration. Now, because the institution supports those sorts of broad, generally beneficial activities, that doesn't trigger a free exercise claim, and it doesn't mean that it has an obligation to fund religious activities for worship groups. Watkinson has the opportunity to practice his Asatru ceremonies. He hasn't been burdened, and there's no discrimination against Asatru practitioners. In conclusion, Your Honors, no law, not our LUPA, not the Free Exercise Clause, not the Equal Protection Clause, no law requires states to subsidize religious purchases for inmates. A DOC can provide those charitable, recreational, and educational opportunities for its inmates without triggering an obligation to fund Mr. Watkinson's worship. He shouldn't be exempt from the prohibition on pooling inmate funds. He shouldn't be exempt from the bar on buying faith group property because those policies serve legitimate, compelling government interests. The District Court was correct to refuse to allow him to co-opt the Prisoner Welfare Fund for his own benefit. This data asks that this court affirm. Thank you. Mr. Anderson, you have some rebuttal time. Thank you, Your Honor. Going back to the burden analysis, we have two types of products. We have the juice and the honey, where the big impediment is the cost, if you have to purchase them through the commissary. But with the firewood, not only do you have sort of the cost component, but there is firewood there on site. And as Mr. Watkinson testified, if he carries the firewood to the sweat lodge, it's fine. But if he carries it to the worship area for the esatru, he can be disciplined. And so you have another type of burden, which is prison discipline. And I think the courts have been pretty uniform that disciplining someone for religious practice is a substantial burden. And so that's with respect to the firewood. In terms of the state says they can't accommodate these things without the Prison Welfare Fund collapsing, again, the state did all this for two years, and there was zero evidence in the record of any sort of problem. And so to say that the state can't do it, again, this comes to the court after the state has already tried it. And having tried it, I think the burden is really on the state to show that there was some problem there, and the state has been unable to do so. With respect to the Hartman case, which was alluded to a few moments ago, there this court has said that the state can pick and choose which religions get a paid prison chaplain. And if we can fund a prison chaplain for the Catholics, then I think that we could conceivably allow the purchase of Jews here. And if the court has any questions, I'll be happy to answer them. Otherwise, I would ask the court to adverse the judgment below. Thank you. The case just argued, Watkinson v. Alaska Department of Corrections has submitted. I do thank you both for your arguments, both very well informed on the case law and the facts. We appreciate that. The court is now adjourned for the morning.
judges: McKEOWN, FLETCHER, Vratil